Judge Goulden, may it please the Court. Both the Constitution and acts of Congress give the President of the United States broad authority to prevent aliens abroad from entering this country when he deems it in the nation's interest. This global injunction restricting that authority cannot stand for three reasons. First, the District Court applied the wrong legal standard. Constitutional challenges to the exclusion of aliens abroad are governed by Mandel's deferential rational basis test, and Section 2C's temporary pause on six countries that shelter or sponsor terrorism readily satisfies that test. What's the difference practically between Mandel, if there is a DEN bad faith exception in the Lemon purpose test? I think it's that Justice Kennedy and Justice Alito indicated in DEN that whatever the scope of that exception, and no court has ever applied it to find bad faith, not the Supreme Court or this Court. But talking about consular officer there, Justice Kennedy and Alito said, look, you've got to have an affirmative showing of bad faith. And I think if that's what you require for a one-off discretionary decision by a consular officer, you really ought to require the strongest, clearest affirmative showing where you're talking about the President of the United States and multiple members of his Cabinet whose motives, I take it, have not been impugned. Whatever the bad faith exception is, to say that the Commander-in-Chief, the head of the Executive Branch, and multiple members of the Cabinet acted pre-textually, I think you ought to require the strongest showing for that sort of a remarkable holding, and I just don't think plaintiffs have put together the kind of record. Do you agree that under our case, Cardinus, that there is a bad faith exception? I do. This Court read Justice Kennedy's concurrence in DEN to be controlling and said there's a bad faith exception. Obviously, it didn't find bad faith in it, but under this Court's case law, yes, that exception's there. So, I understand your position, it's that the DEN exception only applies to individual visa denials? No, I don't think so at all. I think DEN applies to the same full scope as Mandel, which is to say to challenges to the exclusion of aliens abroad. Whether those exclusions are the Congress or the President, whether they're statute or an executive order, Mandel has always governed those kinds of challenges, and I think the difference between DEN and a McCreary-Lacoumie type inquiry is that DEN requires at least some affirmative showing of bad faith. I think here, in this context, it ought to be a really high one, so it isn't just a sort of wide-ranging de novo inquiry into subjective motivation. If we conclude that the District Court applied the wrong standard, the government's position is it should be Mandel, correct? That's right. So, shouldn't we send it back to the District Court to apply Mandel and to see if plaintiffs can make out an affirmative case of bad faith? You could send it back, Judge Hawkins, but I have to say that I think plaintiffs haven't sought any additional discovery here. We have a record. We know what the statements were, as a matter of fact, and I think this Court is as well-placed as the District Court to look at those statements and to determine, in the absence of testimony or credibility determinations or any of that, none of which went on below, are those enough to get us bad faith under DEN? I think it would be the same inquiry in the District Court as in this Court. Is there any case? There is no case like this, is there? Well, no, Judge Pines. I think in part because no one has ever attempted to set aside a law that is neutral on its When I read Mandela, it's clearly dealing with a specific application of standards to a specific visa denial, and that's not what we have here at all. No, but of course, Judge Pines, the Supreme Court in Fialo applied it equally to a statute. Courts of Appeals like the Second Circuit have applied it to broad policy determinations by the executive. I don't think the Supreme Court or really any of the Courts of Appeals has ever tried to limit the Mandela test to just a discretionary denial of a visa by a consular officer, and I think for the reason some members of this Court gave at the rehearing stage in the Washington case, it really wouldn't make much sense to say that a single consular officer overseas and denying a visa gets more deference than the President of the United States in making a formal national security determination in an executive order. In the context of this case, the executive order is an extremely broad order. We're not dealing with an individual one-off determination by a consular officer. It is a policy, and of course, Judge Pines, that's what executive orders do. They don't deal with one-off denials, but I don't know that it's an extremely broad policy. I mean, Congress and the previous executive designated these countries as those that sponsor shelter terrorism. How many nationals does it apply to out of those countries, a large number? Well, I mean, whatever the number of nationals who try to travel to the country and can't otherwise obtain waivers, we don't know yet, obviously, because we haven't been able to implement the order, but my point is just the distinctions were made by Congress and the previous administration who took individuals with connections to these countries out of the visa waiver program. This administration, to be sure, said as a matter of policy, I'm not sure that's enough. I don't know if I'm getting reliable information from the governments of these six countries, so I'm going to put a brief pause on entry while I look at the vetting procedures for those nations subject to a pretty robust individualized waiver process. That's a policy judgment, to be sure, and it's a difference in degree, but I don't think it's a difference in kind from what the previous administration did. Can we go step back just a little bit? Your brief, you start off with by challenging the standing, Dr. Elshrek, in Hawaii. Right. Is that a still core argument for you in this case? Yes. I mean, we've made the arguments in our briefs, but I think the easiest way to think about it, if I were going to boil it down, Judge Pai, is this- You didn't raise standing at the district court level, correct? No, we did. We argued extensively in the district court about whether they had both Article III injury and prudential standing, Judge Hawkins, but if you look at the Cardenas case, Judge Pai, I really think that's the roadmap. This court said correctly, look, the denial of entry to aliens abroad is generally not reviewable because those aliens don't have any constitutional rights. U.S. citizens can attempt to argue that their own constitutional rights have been infringed by the denial of entry. The problem here is Hawaii doesn't have any rights to claim under the Establishment Clause of the Due Process Clause. It's really down to Dr. Elsheikh. He's not raising his own Establishment Clause right. He is raising his own Due Process Clause right, so if you think he's got Article III injury, he can at least raise his due process claim. The problem with that claim is it fails on the merits because he doesn't have a protected liberty interest with respect to his mother-in-law. How do we evaluate his claim in light of our holding in Catholic League? I don't think, Catholic League doesn't suggest that, it doesn't take any issue with the general rule that where you're claiming alleged discrimination on some basis like religion, only the victims or putative targets of that discrimination have standing to challenge it. Here this order is aimed at aliens abroad who themselves have no constitutional rights. Dr. Elsheikh doesn't have an Establishment Clause right to raise and I don't think the Catholic League case indicates any differently. His argument is that, go ahead, his argument is that in reality this is a ban against members of adherence of the Islamic faith, correct? That's his argument. No, that's right. And that this broad policy disparages adherence to that faith in the same way that the individual residents of San Francisco County felt disparaged when the Board of Supervisors of the Catholic League adopted this resolution saying that the Cardinal of that diocese was acting in a terrible and un-American way by refusing to refer adoptees to same-sex couples. So what's the difference? So I think you have two key differences. One, that was explicitly religious speech. This is not. The order on its face doesn't have anything to do with religion and in operation doesn't distinguish on the basis of religion. And two, that explicitly religious message was directed at the community of which the plaintiffs were a member. Here this EO operates with respect to aliens abroad and so the way plaintiffs try to get around that is they say, oh, well it sends a message and it sends a message to all Muslims in America. And I think the problem they have with that and the DC Circuit said this in the Navy Chaplaincy case is if you can take government conduct directed toward others and reframe it as a message directed generally to all people aware of the government conduct, you've both overturned in effect cases like Valley Forge and you've eviscerated settled limitations on standing. I mean, this is at least two bridges beyond the Catholic League case. Well, Dr. El-Sheikh, isn't he an imam if I'm not mistaken, if his local... Yes, he says he is. I mean, it's direct to him, isn't it? Well, the suspension of entry is just on the nationals of the listed countries. Now, yes, as a U.S. How does his mother-in-law fit into this? His mother-in-law is a national of one of the listed countries. She can apply for a waiver. I think based on what they've alleged, it's exceedingly likely she'd get one, which I think goes to show... And how does that affect his injury or harm? I think it shows that his harm is speculative and his claims are unripe. But if you disagreed with us on that and you found that he had standing, then I think you'd turn to the merits and what you'd say is he's attempting to raise an establishment clause claim on behalf of somebody else. That's not properly before the court. He is raising his own due process claim, but it fails on the merits because no court has extended the due process right to in-laws and whatever process he wants, this order more than gives it to him and his mother-in-law because there's no doubt about why, if she doesn't receive a waiver, which we think she's likely to, what the reason for that would be. It's on the face of the order itself. There's nothing more that we could tell you and that's why below they disavow any desire for individualized hearings or the like because this is a categorical policy. There's no more process we could give them and they've never said what it would look like that would do anything more to inform them about what the reason for the EO is. I think what they're really raising is a substantive challenge, but again, they have two problems. One, they can't make out that case on the establishment clause side and two, they never pleaded a substantive due process claim below. They phrased it only in procedural due process terms. She's not seeking an immigrant visa, correct? I believe she is seeking. No, I guess it's a non-immigrant visa to visit. I think you're right, Judge Hawkins. She wouldn't fall within 1152, however that relates to 1183 or whatever. That's right. I mean, and I think our position. And the doctor is not the sponsor, correct? I believe it's his wife that is the sponsor, but I'll leave it. Is she a plaintiff? No, she's not a plaintiff. I take your point, Judge Hawkins, and just to say a word about the statutes to make clear how we think they operate. 1182 applies to entry by its terms. Nothing in 1152 which deals with the issuance of immigrant visas limits in any way 1182, nor could it. It would raise serious constitutional problems. If, for instance, it were to disable the president from suspending nationals from a particular country, if, say, he got actionable intelligence that someone was attempting to bring, let's say, a dirty bomb into the country. So really what we're just down to is the question, are we required to issue immigrant visas to the 30 percent of people affected by this order who want immigrant visas, even though once they arrive at the borders, we can keep them from entering under 1182F? You can see before the Fourth Circuit that is a practical effect implementation of the pause or ban, however you want to phrase it, sort of precludes relief under 1152. Yes. What we told the Fourth Circuit was the State Department has always implemented suspensions under 1182F by denying visas because otherwise you'd be letting people come to the country with visas, a travel document, and then once they got here at the borders, you'd be turning them away, and the State Department has never read 1182 or 1152 to require that kind of fruitless and harsh exercise. We also told the Fourth Circuit the same thing I'll say to you. If you agree with them on their reading of 1152, it can't ground the current injunction. At most, it would be an injunction against the government that would require us to issue immigrant visas to people who wanted to come here, even though once they arrived, we could keep them from entering under 1182F. We don't think that system would make a lot of sense. Like Tom Hanks at the airport, right? I think that's right. And that's why the State Department has always said that when you are denied a visa under 1152, it's only because you are validly suspended under 1182F. That's the reason. It's not, in effect, a nationality-based sanction. But again, if you disagreed with us on that, it would be the basis for a different injunction, one that I think would be practically pretty fruitless and harsh, but that would be the result. I don't think there's any way that you can read 1152 to limit the President's suspension of entry power under 1182F. So once you make that move, then there's no basis for the injunction. Well, I think you have to read them together. That is, you're dealing with a process. Isn't that right? I think that's right. But the way to reconcile them, I think, Judge Paius, is the way that the State Department has, which is to say, look, 1152 governs the issuance of immigrant visas all the time in lots of other contexts. Where you have 1182 suspension, we're not denying you on the basis of your nationality. We're just denying you because you've been validly suspended. But if you thought they conflicted, I'd still say 1182F as the more specific would trump. Because what you're talking about is the President making a specific finding with respect to these categories of aliens and then suspending their entry. But again, I'd have to give you... But 1152 was more recent. Congress passed that one in 65? That's right, but then you'd have to get past the presumption against implied repeals. You'd have to say that Congress... When Congress passed... Why is that an implied repeal? You read them together. Well, because I think... We're taught to reconcile statutes and to read them together. Completely, but I think it's pretty clear that what Congress was doing was getting rid of the previous nationality quotas on immigrant visas. It wasn't doing anything to limit the President's suspension power. And I just want to point out, by the way, I mean, if you really take their argument seriously, I think they're committed to the view that under 1182-F, even if the President got actionable intelligence tomorrow that, let's say, a Libyan national were attempting to enter the country but the President didn't know his identity to commit some terrorist act, they'd say, well, the President can't suspend entry of all Libyan nationals for some short period of time because that's a nationality-based distinction. I think that would raise serious constitutional concerns, and so courts have never read the statutes to conflict in that way. They've always reconciled them. Solicitor General Wall, if I could interject a question on the merits here. The executive order sets out national security justifications, but how is a court to know if, in fact, it's a Muslim ban in the guise of national security justification? Judge Gould, I think that's the nub of the case, and that's Mandel. In Mandel, Justice Marshall in dissent said, look, if you'll take even the briefest peek behind the reason that the Attorney General has given, you'll see that it's not really why they denied him. They really denied him because he was a communist and he wanted to come in and give lectures on communism, and the court said, we're not going to look behind, we're not going to take a look at any of that evidence that's in Justice Marshall's dissent. This is rational basis review. Is it a legitimate purpose on its face, and is it bona fide? Does it bear a rational relationship to what the government's done? And this court in a number of cases has said, Mandel's rational basis review. And I think the benefit of that standard, as the court recognized in Mandel, Judge Gould, is it doesn't call on courts to make these sorts of determinations, the second guessing of national security determinations, that they're sort of ill-equipped to do. And the flip side, of course, is what the plaintiffs want in the Washington case, right? They've asked for up to a year of discovery and up to 30 depositions of White House officials to find out exactly what was in the heads and what were the motives of the people framing this EO, and that's the road that in Mandel the Supreme Court clearly said it was not going to go down, subject, as Judge Pius said, to the narrow bad faith exception in Dinn, where you've got an affirmative showing of bad faith, and here you would need official capacity statements that were unequivocal, right, post-inauguration, to show that the president and members of his cabinet were acting in bad faith, and I just don't think they can make that kind of a remarkable showing here. Let me ask the same question that my friend Robert King asked you a week ago. Has the president ever disavowed his campaign statements? Has he ever stood up and said, I said before I wanted to ban all members of the Islamic faith from entering the United States of America? I was wrong. I've consulted with lawyers. I'm now addressing it simply to security needs. Has he ever said anything approaching that? Yes, Judge Hawkins. He has said several things approaching that, and I think it's detailed in various amicus briefs. The best one is probably the Southeastern Legal Foundation brief, and part three walks through the comments and shows that over time the president clarified that what he was talking about were Islamic terrorist groups and the countries that shelter or sponsor them, and over time he and his advisors clarified that what he was focused on were groups like ISIS and al-Qaeda, and really the one post-inauguration statement they've got, though we all know what that means, I'd encourage the court to go back and look at the ceremony in which the president signed that executive order. The second one. Well, that's the first one. They don't have anything on the second order, but even if you said, okay, that's the first one, and we'll carry that through, which for various reasons we've said you shouldn't. Those statements were his surrogates have said the president is simply carrying out his campaign promises on this issue. But that's true, Judge Hawkins, because during the campaign he clarified that what he was talking about were territories and countries that Congress and the previous administration had determined were dangerous, and what he wanted to do was, he said, increase the vetting procedures, and that's what he said three minutes before he signed the first order, standing there next to the newly sworn-in Secretary Mattis. It sounds like you argue that our approach to these statements should be sort of an abusive discretion review. If you could read the statements, good or bad, we should defer to the good. I think the value of the Mandel standard is that you don't look, is that courts don't start engaging in this, but if you do, and for the reasons we've said in our briefs, we think it's a matter of why you shouldn't, but if the court were taking them all into account. And here I mean not just the post-inauguration official capacity statements, but the campaign trail stuff. We would still say, look, the President clarified over time, and in the face of ambiguity about that, both respect for a coordinate branch and the presumption of regularity would require not reading them, I think as the district court did here, in the light most hostile and least favorable to the President. You're right, we did receive a number of briefs in this case, a number of amicus briefs. And Judge Hawkins' question reminded me of something that caught my eye in one of the briefs, which is the brief from the Korematsu Center. Would the Korematsu executive order pass muster under your test today? No, Judge Bias. Why not? Facially legitimate, that's all you say. You emphasize facially legitimate. I want to be very clear about this. This case is not Korematsu, and if it were, I wouldn't be standing here and the United States would not be defending it. When counsel said below, and this is at page 116 of the supplemental excerpts of record, look, we'll concede that an order like this might well be constitutional in other contexts, where you didn't have statements like this that they were attributing an impermissible motive. I think you know right then you're not anywhere approaching Korematsu. I cannot imagine that any court would say that the judge's position is clear. How do you apply the facially legitimate standard to an executive order like that? I mean, there was no reference to Japanese in that executive order, and look what happened. Judge Bias, I'm not familiar with all the ins and outs of that executive order. I haven't gone back and looked at it. I can't imagine that courts would say that it survived the Mandel standard. But the point is just I think counsel here have implicitly recognized below that if some other president had done this without these statements, that this executive order would almost certainly be constitutional, and then what they're left with are the statements. And they're saying, all right, look, on its face it's neutral. It doesn't operate on the basis of religion, but we think the president made clear over time why he was really doing it, and you should look behind it. I think that's a very different situation from Korematsu, and I don't think they've pointed to a single case either under Mandel or even if you went under McCreary and Lukumi that would say we have a law that isn't a religious gerrymander like Lukumi. It's not explicitly religious like McCreary, but we're still going to set it aside based on what we believe to have been the subjective motivations of the president or the advisors who adopted and crafted the policy. That's a really remarkable holding judged by us. Is a bad faith determination under Din the same thing as a purpose determination under Lemon? I think it's a little different in the sense, Judge Hawkins, that look, it's one sentence of dicta in the Justice Kennedy concurrence, so I don't want to read too much into it because no court's ever applied it to actually find bad faith, but I think what he has in mind there is pretext. He cites the portion of Mandel where the court reserves the question of what would happen if the executive put forward no justification at all. So I think what he has in mind is when the consular officer either gives you no reason or gives you a reason that's obviously untrue on its face, a pretext sort of finding, I think that's a little different from purpose, and again, to say that the president and three members of his cabinet acted in bad faith pretextually by adopting an order and saying on the face of the order that it is for national security purposes when it's not, I think to go down that road, you would need the strongest and clearest showing of bad faith. Solicitor General Wall, I would appreciate hearing a little more on the government's view on the statutory side of the case, and specifically what I have in mind is that there's, in 1182, there's a need to find that entry would be detrimental to the United States, and so I have a question whether there's an adequate finding of detrimentality to justify keeping everybody from a particular company out of the country, from a particular country, out of the country, and then I also have a question on making it a national origin ban, because that seems to conflict with the 1985 statute, although that was limited to immigrant visas, but if you could touch on those issues, I'd appreciate it. Sure. So Judge Gould, on the first question, and the Fourth Circuit had a number of questions about this too, the president in sections 1D and E and F of the order makes clear that what he's concerned about, he's really two things. One, the ties between terrorist groups in these six countries that were listed by Congress in the previous administration, and the concern that the governments of those countries and the deteriorating conditions in places like Iran and Syria may mean we're not getting reliable information, and so what the president found was he said, look, I find that it would be detrimental to let in their nationals for a brief period of 90 days while I ascertain whether the vetting procedures that we have in place for these countries are actually adequate. So he wasn't saying I find that it would be detrimental because they're all dangerous or they all are potential terrorists or anything like that. He was saying in the face of uncertainty about whether we're getting good information from their governments so that we can screen them out in the visa process, I'm going to put a temporary hold subject to the visa waiver, and I think under a Mandel rational basis review, but frankly under any legal standard, I think the president's detrimentality determination there would easily survive. The second half of your question gets back a little bit to what Judge Hawkins and I were talking about. 1182 is entry. 1152A is issuance of immigrant visas. The State Department has always reconciled those by saying that when the president suspends a group, even if in part on the basis of nationality, but the reason for the denial under 1152 is not the nationality, it's that you're subject to a valid suspension. So the State Department has in practice always reconciled them so that we're not giving travel documents to people who would arrive and then we would keep them from entering. But again, if the court disagrees with us on that, I think at most it would be the basis for an injunction that said for the 30% of aliens or so subject to this order who want immigrant visas, we'd be required to give them the visas even though when they arrived we wouldn't have to allow them to enter the country because of the 1182F suspension. I think as the District Judge in the Maryland case recognized that that wouldn't be a sensible result. I think the State Department's reading of these statutes is the far more sensible one. But no matter what reading you take, unless you say that the president is disabled, every president primarily, for making any nationality-based distinctions under 1182F, Reagan with the Cubans or Carter with the Iranians, unless you take that road, I don't think there's any way to read the statutes that could provide the basis for the injunction we have here. And if I could just reserve the remainder of my time. Thank you. Thank you. Thank you, Judge Gould, and may it please the Court. The government would like to pretend that this Court's decision in Washington v. Trump never happened, but it did and the government can't shut its eyes to it. There's a simple test. Ask yourself, if you accept any of the arguments you just heard, would it have altered Washington v. Trump if the answer is yes, that settles it. So when the government claims that Mandel applies, even though Washington said it didn't, when the government claims you can't look beyond the face of the order, even though Washington said you could, when it claims the injunction harms national security, even though Washington said it didn't, and when it says the state doesn't have standing, all of these were things raised and decided by Washington v. Trump. If I could... Did the Washington panel decide the application of Mandel on the merits or to simply say that courts have jurisdiction to review such things? It resolved the question of whether the Mandel standard of bona fide is bound by that. I do, and if I could read to you the language from Washington v. Trump, this is found at page 1162. The government cites Mandel for the proposition that, quote, when the executive exercises immigration authority on the basis of a facially legitimate and bona fide reason, the courts will not look behind that. The government omits portions of the quoted language to imply that this standard governs judicial review of all executive exercises of immigration authority. In fact, the Mandel standard applies only to executive branch officials to issue or deny an individual visa. The present case, by contrast, is not about that application of a specifically enumerated congressional policy. That's this case. You read a little bit more into the case than I did. I'm just reading to you... Well, I do. Well, I understand that, but they didn't really decide those questions. They decided that case based on due process. Oh, they certainly decided on due process. I'm not saying that they reached the establishment cause and found a violation. I am saying, however, for persons of Mandel, the government came before this court in Washington v. Trump and said the standard that governs all of this case is facially neutral and bona fide. This court recited that standard back to them and said it doesn't apply. That is a square holding of this court. If I could, I'd like to start with Judge Hawkins' question about the establishment clause. You asked my friend, Mr. Wall, has the president ever disavowed all of these statements? And I thought his answer was surprising because he couldn't actually point to any disavowal. He just cited en masse amicus briefs because the truth is there is no such statement. We give you, chapter and verse, the things the president has said. The district court gave them to you as well. They're both pre- and post-inauguration. There's not just one. Starting in December 2015, when he called for a total and complete shutdown of Muslims entering the United States, then a few months later, I think Islam hates us. We can't allow people coming into this country who have this hate of the United States. Then a few months later, my opponent would admit tens of thousands of refugees from the Mideast would try to take over our children and convince them how wonderful Islam is. Those statements are profound. I'm familiar with them. We've read them and everything else. It is a little bit concerning, though, that those statements take place during the midst of a highly contentious campaign. Absolutely. Don't you need to look at it from that perspective as well? We wouldn't be standing here if it was just campaign statements on its own. But as the district court found, the president rekindled those statements through his actions as president in two different respects. First, when he issued the first executive order, he read the title of the executive order, looked up at the camera and said, we all know what that means. That's at SCR 148. If it was clear from the title what it meant, he wouldn't have had to say it. It's a reference to something else. Indeed, when he issued both executive orders, he left on his website that very statement about the complete and total shutdown of Muslims, a statement that just happened to disappear moments before the Fourth Circuit argument last week. So I think the question is, what would an objective observer view these statements as? And as the district court found, it would view them as an establishment of a disfavored religion of Islam. We're not saying that we're not in favor of psychoanalysis or trying to get into the president's head. You don't, Your Honor, need to be Sigmund Freud in order to affirm the district court. You just simply must ask, as the Supreme Court has told you, what would an objective observer think with these sorts of statements? And these statements, by the way, just one last point, do continue. Even last month, the Doe Brief, which was filed before you, says even last month, the president said, it's a lot easier for Muslims to immigrate than Christian refugees from the Middle East, and, quote, he's going to be helping the Christians' big league. So this is a repeated pattern of the president. Indeed, two months ago, to this day, when the district court struck down the injunction in this case, this is an SCR 84, the president said, quote, moments ago, I learned that a district judge in Hawaii, part of the much overturned Ninth Circuit, just blocked our executive order. This is a watered-down version of the first one, and let me tell you something. I think we ought to go back to the first one and go all the way, which is what I wanted to do in the first one. Does that mean that all those statements, post-election statements, even the one you just read, does that mean that the president is forever barred from issuing an executive order along these lines? What does he have to do to issue an executive order that, in your view, might pass constitutional muster? Not at all. So I think there's two paths that the president could take in order to pass constitutional muster. One is the way that our founders thought, Article I, Section 8, which is Congress, which is in the driver's seat with respect to immigration, passes a statute, and as Justice Alito said, when Congress passes a statute, it's much less likely to discriminate 535 people versus one, which is why his Mandel point is so problematic. That's number one. Second thing he could do is, the president could do all the kinds of things, or some of the kinds of things, remove the things that the district court found led an objective observer to say that this discriminates. So one example would be what Judge Hawkins said about disavowing formally, you know, all of this stuff before. But that's not it. I mean, he could do a lot of things. He could do, for example, and I'm just going to throw out some examples. I'm not trying to micromanage the president. But he could say, you know, what President Bush did right after September 11th, quote, the face of terror is not the true faith of Islam. That's not what Islam is about. Islam is peace. Instead, we get, quote, Islam hates us. I think Islam hates us. I think he could point to changed circumstances from December 2015 when Congress debated the exact same evidence that the president relies on in his executive order and say, you know, we actually need more than just denying people entry without a visa, which is what Congress required. You need to do more than that. You know, it could eliminate the text, which refers to honor killings. You know, there's a bunch of different things that could be done. And a fundamental point to you is that presidents, you know, the presidents don't run into establishment clause problems. And the reason for that is that this is a very limited, you know, in a really unusual case in which you have these public statements by the president. Indeed, if you affirm the district court, there's not a thing that any president has done in our lifetime that would be unconstitutional. Before the Fourth Circuit, one of the judges asked, well, suppose it had been another president, another individual that issued the same executive order and hadn't said all these things. Would it pass constitutional muster? Oh, so I think the most important point is if you don't say all these things, you never wind up with an executive order like this, which is why no president has done that. But I take the hypothetical. And if that hypothetical arose, I think it would be different. That is, context matters. The Supreme Court in McCreary, for example, says, look, you know, governments can close shops on Sundays. And if they do it because of labor, they want to give workers a rest. That's fine. But if they do it, and at the same time announce the reason why I'm doing it is to, you know, is to help churches, that's obviously an Establishment Clause problem. And so that's why context matters. It always has in the context of the Establishment Clause. And here, the history is overwhelming. And that's why this is so unique. This is not, you know, something that is going to hamstring any president from, you know, anything that's happened in our lifetimes. This is a very unusual circumstance in which you have all of these different statements. You've, in your brief, and before the district court, you argued the statutory grounds quite extensively. Could you respond to the government's argument? Absolutely. That the two statutes need to be read separately? Yeah, I think Judge Paez, you had it exactly right. So, you know, our basic statutory argument, I'll respond to the government, but let me just set out exactly what the argument is, which is that the president is claiming a sweeping power, essentially to set aside the INA. In fact, the president refers to, quote, an absolute right to ban any group or anybody. That's in our brief at page three. And if you read it that way, if you listen to what Mr. Wall said, you are giving the president the ability to take a magic eraser to the entire United States Code with respect to immigration and nullify anything because of this 1182 provision. And that can't possibly be what the statute is about. That is, there are four problems with their statutory argument. One is what you were just referring to, Judge Paez, about 1152, that this is a nationality-based discrimination. But there's also three other things. It also flouts Congress's finely-reticulated scheme, the terrorism bar. It's a ten-part test for determining whether someone could be excluded on an individual basis on grounds of terrorism. 1182A. That's 1182A, and it's also some other provisions. So that's there. In addition, you have Congress's specific judgment on the very evidence that is in the executive order from December 2015. And what Congress said is, you know, we don't need to have group, dragnet-based exclusions. We just need to insist on visas when people come in with respect to these very countries. And then the last, and I think maybe the most important thing, and it sets up your question about Korematsu, is, you know, the government has not engaged in mass dragnet exclusions, you know, in the past 50 years. This is something new and unusual, in which you're saying this whole class of people, some of which are dangerous, we can bar them all. Our brief at pages 37 to 42 explains this in detail. The government has not a single answer in their brief to this. And so I think those are the statutory violations. Now, you said, well, can't you read them together? And we think that's, you know, absolutely the right way to view this. This is not an implied repeal. Section 1182-F gives the president broad powers. We don't disagree with that. But the one thing it can't do is to violate a statute and supplant a law of Congress. To do so is to basically transform the statutes into mere suggestions and nothing more than that. And so, you know, when the Congress says, in clear and unmistakable language, you know, that no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's nationality, that's pretty clear. Now, my friend on the other side says, well, if you read it that way, then there'll be a Libyan who's going to come into the country and so on. But I think Judge Santel in the D.C. Circuit answered that very clearly by saying, no, there's obviously an emergency exception if Congress can't meet or something like that. The statute isn't going to reach such a thing. But here, there's no emergency precluding Congress from acting in this way. If there is a statutory violation here, what's the relief to correct the statutory violation, putting aside the Establishment Clause for a moment? Right. So we think because there's different statutory violations, Section 2 does fall, that is, as a whole. That is, they're supplanting Congress's fine-grained terrorism scheme with a dragnet ban, and so the whole thing falls. I think you might be asking just about 1152 in the immigrant visas provision if we find that. Our point to you in our brief says this, and it starts with Judge Friendly's opinion in 1966, the year after this landmark statute was enacted. Congress didn't just say something about immigrant visas. And by the way, Judge Hawkins, the mother-in-law, is seeking an immigrant visa, a green card for Dr. Elsheikh. Congress said more than that. I think that's what your opponent said. OK, so I just want to make sure. So Congress said in 1965, we are changing fundamentally what our immigration system is about, and we are not going to engage in nationality-based discrimination anymore. And that extends even to non-immigrant visas. The American Bar Association brief goes through this in painstaking detail, as well as 165 members of Congress that have come before you and have explained exactly why that's so. Indeed, the government in the Olson case actually didn't even contest that. They said, yes, it applies to non-immigrant visas. So I think, you know, it's a transformational statute. And indeed, no president has done anything like this since that statute was enacted. So you think 1152 applies beyond immigrant visas? I do. So I agree with you, the text doesn't. But as Judge Friendly found, and indeed as the government conceded in Olson, it does extend beyond that because of the way in which this statute took relevant factors and said, nationality is no longer a relevant factor for purposes of our immigration. And you would have us look to what you argue is the purpose of the statute as opposed to its language. Oh, no. I'm just... I wouldn't say necessarily the purpose. I think that the statute... Immigration law has always, as the Supreme Court said in Judulong v. Holder, you always have to look to relevant factors and understand what does Congress deem relevant and what not. And I think that when you ask yourself that question, nationality is now no longer such a factor. That is, this was a transformational statute in 1965, passed contemporaneously with the Voting Rights Act. And so that's why. So again, that's on the 1152 argument. But I don't want the court to lose sight of the other bigger argument, which is that 1182, which sure looks like it's a broad statute, but it does ultimately supplant the more specific, fine-grained, ten-factor test that Congress laid down. And the government itself has said to the Supreme Court in the Marks case that when you have a more specific statute, that controls over a general grant of authority. And indeed, Supreme Court case after Supreme Court case, like Witchkovich or Zadvydas or so on, have said, look, this statute looks like an unbounded delegation of authority, but actually we have to read it more narrowly. Counsel, if I could interject a question on the statutory issues. If we were to conclude hypothetically that the Establishment Clause claim can't support the district court's injunction, could we still affirm the injunction on statutory ground? Absolutely. Either in whole or in part, and also related to that, could you touch on whether there's standing, the basis of your client's standing on the refugee provisions? And I think that would help me out. Absolutely. So if you accepted our larger argument about the statute, Judge Gould, about 1182, then it would, I think, affirm the district court's injunction as a whole. It's true that 1152, the nationality-based discrimination, the way to uphold the injunction as a whole would require reading the statute to encompass non-immigrant visas as well, as Judge Hawkins was illustrating. And so that is our reading. We think that's the way, since Judge Frederley's opinion, this has been read. But there's obviously going to be some, there could be a question about that.  both plaintiffs, we think, have standing. Hawaii has standing, because in Washington versus Trump, the court actually found that the state of Washington had standing, indeed, even on the refugee claims, which are before the court. And here, we have identified, indeed, the government has pointed to three refugees that have come in this year, in 2017. They said this in the district court proceedings below. And so Hawaii has an interest in making sure that its refugee programs and the dollars it spent are actually being able to be used and a flat ban on all refugees, which is what that executive order is, would basically force those dollars to be wasted. And with respect to Dr. Elsheikh, he, too, has standing with respect to the refugees. His mosque actually has a refugee in it. I mean, he's the imam of the largest mosque in Hawaii. And so I do think for all of those reasons, there would be standing. Does he have standing on 1152? On 1152, he does, because... I mean, if we assume that that only applies to immigrant visas, does he have standing? He does, because she is seeking an immigrant visa, a green card, in the LaVos case, the D.C. Circuit case by Judge Sentel, allowed family members to bring a lawsuit and found it had standing, so it does. Let me ask you a question. The government makes the argument that if you look at the statements surrounding... First of all, if you exclude, and this is a hypothetical, if you exclude the campaign statements, if you look at the statements around the time of the issuance of the second executive order, including, you know what this means, language, that there's one way to read it, saying it's bad, there's one reason way to read it, saying it's good, why shouldn't we be deferential to the Office of President of the United States on such issues? So that's the million-dollar question, Judge Hawkins, and I don't think there's any precedent in this court or any other that says that when you're thinking about what a reasonable observer would view as an Establishment Clause problem, that you defer to a government official. Rather, the whole test is an objective observer, not what the President thinks. We're not impugning what's in his head. We're just saying, objectively, this is how a reasonable viewer would see it. If you viewed it the other way and gave deference, then you'd really be giving the President the ability to bootstrap all sorts of things and say, well, you know, enact all sorts of discriminatory policies, but then say, you have to defer to me. I don't think it's discriminatory, which, by the way, he hasn't even quite said. But you'd be in, I think, a really dangerous situation, and indeed, our founders were particularly concerned about the idea of immigration restrictions being used to establish a religion. That's actually what happened in colonial Virginia. And so I think the best way to think about it, and this is what the Supreme Court says, is think about what an objective observer would view this as, and the best evidence to say what an objective observer would view this as is, I think Judge Pius pointed to this, there are amicus brief after amicus brief. I'm not aware of any case like this in which so many different amicus briefs from across the country representing such a wide swath of life have said this is an establishment clause violation, that this enacts a disfavored religion, Islam. That includes 17 states, including states like Iowa and North Carolina, over 30 cities and counties, including Seattle, Los Angeles, New York City, San Francisco, South Bend, faith leaders and groups from across the spectrum, including the National Council of Churches representing 40 million Christians, Episcopal bishops, the Unitarian Association with 1,000 different congregations, the Alliance of Baptists and Sikhs, the Anti-Defamation League, professional associations like the SEIU and American Federation of Teachers representing 5.2 million workers, indeed, even the Cato Institute. They're all coming before you and saying, look, this is unprecedented. We have not seen anything like this in our lifetimes in which a president is establishing a disfavored religion. And with real consequences, this isn't just the president saying something without action. This is the president's action as well. You've argued in the past to give deference to the executive in immigration matters, haven't you? Sure. In United States against Texas, I think you wrote an amicus brief in which you said the particular demands of the immigration system in fact require the executive to wield broad discretion. The executive must prioritize enforcement resources in a way that makes the immigration system function effectively while balancing a range of foreign policy, national security, economic, and humanitarian concerns. Absolutely, and we don't disagree with any part of that, Judge Hawkins. Rather, what we are saying is that the president has to implement Congress's will, but it can't be an unbounded delegation. Indeed, I think if you read the government's brief, you might think, oh, the president can have this in such a sweeping delegation that he could even name classes of people or nationalities and so on. And really, the government derives its strength from the Abizak case. This is the reply brief at page 21. When you go back and look at what that case is, because they try and pass this off as the majority opinion by then-Judge Ginsburg, Ruth Bader Ginsburg, they're actually citing from the dissent by Judge Bork, not the majority opinion. They don't tell you that. And yes, the dissent says that, but the majority has never said that. The law has always been that even when there is a delegation of authority, it's still got to be viewed within an overall context of the immigration scheme. And to view it the way they do would allow the president to take a magic eraser to the entire code. Obviously, the brief in that Texas case is not about the Establishment Clause or anything like that. We understand what that was about, but you also wrote a brief in Flores v. Lahr. I've been busy. In which you said, U.S. policy towards aliens is vitally and intricately interwoven with the conduct of foreign relations, a power that is likewise vested in the political branches and any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution. Right. When I was in the government, I tried to get the Supreme Court to bite on that. They didn't. And I think for, you know, but even still, look, we're not here saying that there's no, you know, the president doesn't have emergency powers, national security powers. Of course he does. The question is, when you have a circumstance like this, when the very evidence that they have pointed to was before the Congress of the United States and they said, you know, we don't need this mass dragnet ban. Instead, we can do something more limited, require visas. That I think is, I think, or that, that is particularly telling, you know, so obviously if it's an emergency situation, it's a different matter, but that's not the world we're in. Indeed, the government points in its executive order to really only three things. They point to two people from Iraq who committed crimes, but Iraq is now exempt from the executive order, and someone from Somalia who came here as a refugee when he was two years old and committed crimes when he grew up, but the executive order exempts Somalia. Suppose the president had adopted this second order or a third order and identified areas of active combat in these, some of these affected countries or in those portions, carefully drawing the map like a legislative gerrymander, if you will, to identify areas where there has been terrorist activity, whether it's ISIS, Boko Haram, Al-Qaeda, the Taliban, and narrowed it down to just those areas. Would that pass your mind? I think it would. I mean, obviously, it would depend on the context, but I think it very much would because that's exactly what Congress did in 2015. It didn't do nationality-based discrimination. This is what the district court found at page ER61. Instead, if you isolate where people have come and visited from as the 2015 Visa Waiver Program works, it doesn't work by where you're born. It works by what passport you hold. It works based on where have you recently been. So if you're a Swiss citizen and you've gone to Sudan, you're covered by the 2015 ban because precisely for the reason you're saying, Judge Hawkins, which is in 2015, Congress determined there might be some security threats in Sudan, but what this does is it says, if you're a Syrian and you're born in Switzerland, you spend your whole life in Switzerland and then you want to come to the United States, no flat ban. You can't come in just by dint of your nationality. That is not something presidents have ever done in our lifetimes. Not quite as specific as Judge Hawkins' suggestion, but the order does refer to conditions in the countries that are listed. Wasn't that sufficient for purposes of facial legitimacy? Again, that evidence was before the Congress in December 2015, and they said the solution is to require a visa. There's nothing more than that, and so I don't think it's detrimental to use Judge Gould's language, detrimental to the interests of the United States. Congress has already made that determination, but even if you do... No, but the first part of the order, the preamble and all the subsections of the preamble, section one, it goes through the various countries and lists conditions in those countries. Now, the conditions that are described are not like what Judge Hawkins was alluding to, but they do make an attempt. Why isn't that sufficient? That was made before Congress in December 2015. Well, I think the other important point as I was saying to Judge Hawkins is if you really believe that, you wouldn't do it on the basis of nationality because you do it on the basis of transit. That is, someone coming from one of those countries, regardless of what their nationality is, would be swept up by whatever the possible presidential action would be. That's how Congress did it, but that's the way to deal with that problem, not this. If I could, I just want to return to the colloquy that you all were having with my friend about Mandel and bad faith because I do see that as quite important to the resolution of this case. Obviously, we think Mandel doesn't apply because of Washington versus Trump, but if for some reason you wanted to get into it, we think that the bad faith exception or as the Mandel language itself calls it, bona fide, is enough to rule in our favor and to affirm the district court's injunction in this case. The reason for that is that this court in Cardenas said that if there is bad faith and affirmative showing of bad faith, then the Mandel standard is met and the action will be unconstitutional. Then I found out that- If you don't consider the campaign statements, do you still prevail? Oh, absolutely because again, I think there's bad faith even past that. First of all, I think the president rekindled all those campaign statements, but even beyond that, all the things that have happened afterwards, including leaving it up on the website, including I want to go back to the first ban, including I'm preferring Christians, big league, all those things, you know, what he said to the Christian Broadcast Network on January 27th, all of those things I think are sufficient. Now, Mr. Wall says, oh, well, you should give more deference to the president than to a consular official and in general, that may be true, but not when it comes to religion and indeed, our founders were very worried about the possibility that one man could establish a religion and certainly, the president can. Any individual consular officer is not going to be able to establish a disfavored religion such as Islam. It's only something like the president, so the stakes actually are much higher when you're dealing with the president and so I don't think that he gets any special deference returning to Judge Hawkins earlier question. Counsel, let me ask you this and I don't mean to usurp your closing language so we'll give you extra time if you need. But, there were letters issued by both the Department of Justice and the Department of Homeland Security. I think on the same day the order was, the second order was signed, more or less, gives support to the order and, you know, say that there are national security reasons we need to do this. So, do those letters neutralize your assertions that the, that the national security interests relied on are pretextual and also, or related to that, do they neutralize the bad faith argument? Because you're not just saying bad faith of the President, you'd have to be saying it's also bad faith of the Attorney General and also bad faith of the Secretary of Homeland Security. Right. So, it's certainly true that those letters were written on the morning of saying, it would be nice to do an executive order like this and then the executive order issues. And, I think that those letters don't change the dynamics at all. Rather, the question is, as the District Court found, and it's all the amici before you found, is, is this executive order viewed from the standpoint of an objective observer, an establishment of a disfavored religion, Islam, and even if there is some national security motivation on the part of these Cabinet Secretaries, that doesn't eliminate the fundamental problem, which is that this executive order was promulgated by the President and he has built it in a certain way and that is the way an objective observer would view it. So, you know, imagine, just ask yourself, if the President said at the time he was signing the order something like, you know, I really hate Muslims or something like that, the fact that Cabinet Secretaries may have a national security justification or something that was sent to him, I don't think would change the underlying constitutional problem. And so, similarly here, we think that those statements taken together as the District Court found, do so. If I could, I have a quick question on scope, if you don't mind. I understand from the Fourth Circuit argument that the District Court in Hawaii construed its injunction to also cover and prohibit the ability of the government to study the issues that they're talking about in the context of the order, to find out if there's more things that could be done in terms of vetting or procedures or transit or visa issuance, that sort of thing. Is there, is there any justification for that portion of the order? For that interpretation? May I answer and then have about a half minute to sum up? We're giving you extra time. Thank you. Thank you so much. So, I didn't really quite understand Mr. Wall's statement to the Fourth Circuit. He said, I take Mr. Wall at his word. He said that they asked the District Court, and he can tell us, they asked the judge in Hawaii, can we go ahead with these studies to determine if there are things that can be done? And I take it he was saying that in reaction to the judges on the Fourth Circuit and bank panels saying, why haven't you done this? Exactly. So, let me read to you his words in the Fourth Circuit and then go through it because it gets a little technical. This is what he said, quote, we went back to the Hawaii judge and said, look, you can't possibly have meant to enjoin internal governmental procedures  for these six nations. And in the face of that motion, the district judge said yes. I don't think that's quite right. That is, they did ask to clarify the injunction not with respect to the six countries and studying the six countries, but just generally can they have internal consultation and the like. And then, which is a little broader than that, my question is, is there any justification for interpreting the district court's injunction to cover what I've just described? Yeah, so, I think, yes or no. The answer is yes if it comes to a worldwide study under the auspices of section 2A of the order. And the reason for that is what was pointed out in our opposition at the district court to their clarification motion at page 13. This was the government's own theory. They said that the study in 2A was integrally linked to the 2C exclusion in the six countries. And so, if you see the two, if you view the 2C exclusion of the six countries as an establishment or a statutory violation, then, the 2A worldwide study has to fall. But Judge Hawkins, let me reassure you, that doesn't matter at all. That is, the government can and, indeed, has been conducting worldwide vetting and increased studies about all of these things every executive order. Recently, they do something along those lines with the laptops? Absolutely. Not just laptops. Two weeks ago, they announced in the Code of Federal Regulations an increase in vetting procedures worldwide. So, the injunction doesn't ban studies at all. It only bans a specific study which is a study designed to carry out what we view as the Muslim ban in Section 2A. And so, the President has been conducting those studies as every executive... Actually, we'll give a chance to hear from Mr. Wall on that. Okay, great. If I could just sum up for 30 seconds or so. You know, last week, my friend, Mr. Wall, closed his argument by saying that the precedent here will transcend this case and this travel ban. And I couldn't agree more. If you were for us, you leave intact the President's powers including every decision every President has made in our lifetimes and you preserve a status quo that has existed for decades. If you rule for him, you defer to the President in a way that history teaches us is very dangerous. You open the door to so much. As Justice Jackson said in the context of the First Amendment and religious freedom case, quote, the First Amendment was designed to avoid these ends by avoiding these beginnings. This very courthouse which tried, convicted, and then later exonerated Gordon Hirabayashi 44 years ago stands as a physical reminder about what is at stake. Our Constitution and laws are better than this. Our Founders wanted America to be a beacon on our coast and that beacon at the end of the day is not the quality of our sports teams or the quality of our soil. That beacon ultimately is the majestic Article 3 and the grand contours of the First Amendment. We ask that the District Court's ruling in joining this unconstitutional and un-American executive order be affirmed. Thank you, Counsel. Solicitor General Wall, you had reserved a couple of minutes but we also went over time on the appellee's argument so we'll give you extra time if you would like it. Thank you, Judge Gould. I'll try not to use all of it. I have just a few brief points. The first is I don't think Washington can be taken to resolve the standard of review in this case. I think it's Mandel and under that... Pretty close, though. Well, it did it in a section called reviewability and to the extent that what Washington said, Judge Paez, was Mandel can't govern broad policy determinations, even plaintiffs don't try to defend that reasoning because it's inconsistent with Fialo and other cases and that's why I don't think this Court should overread it. Under that standard, I'm glad to hear counsel say, look, we wouldn't be up here if it were just the campaign statements. I'm glad to hear him say that because those are not statements in an official capacity and they don't tell you what the official objective of government conduct is. People say things on a campaign trail and then they take an oath to uphold the Constitution, they form an administration and they consult with them on the policies they develop and we shouldn't start down the road of psychoanalyzing what people meant in the campaign trail and then I think he's down to a handful of statements and the only one that directly concerns this order is what the President said when he signed the first one. We all know what that means and what the President said three minutes before he signed that in the presence of the newly sworn in Secretary of Defense was, I'm signing this order because I want to increase the vetting procedures for radical Islamic terrorist groups. Three minutes later when he signs the order and he makes this six word offhand comment, it's clear in context and I think it's at least you know, within the presumption of regularity that we ought to afford to the head of a coordinate branch, what he's talking about are terrorist groups, not all Muslims everywhere in the world. There just isn't enough in this record to get you to bad faith under den and I think council wants to discount how remarkable it would be for the court on a handful of statements made by the President on both sides, right? You could look at SCR 90 where the President says, I want people to come here who love this country. Many Muslims do. And we can go back and forth on the President's comments over time and that's just not a judicial inquiry like what Mandel commands courts to do and under that inquiry there is not bad faith here. On the statute, you know, for all of the rhetoric Judge Hawkins, the language of the statute doesn't get you where he wants to go. 1152 deals with the issuance of immigrant visas.  and it doesn't deal with non-immigrant visas. We make nationality based distinctions in the non-immigrant visa context every day that we have every day. That's what the visa waiver program is. Nationals of some countries have to get a visa nationals of other countries don't. And Olson doesn't say anything different. At most it gets you an injunction very different from this one. One that I think would actually be more harsh to the people that counsel purports to defend. But none of it gets you a limitation on 1182F which Judge Ginsburg in footnote 2 of her decision in Abu Razak said is the President's sweeping proclamation power to suspend the entry of any class of aliens when he deems it in the nation's interest. And I know counsel wants to second guess the exercise of that power here. But he's right. Whatever this court says will govern President's exercise of that authority for years and decades to come. And no court has ever read into 1182F ever the kind of limitation whether from 1152 or any other statute that counsel wants to find in it. The last thing I'll say is just the over breadth of this injunction. Counsel didn't mention the internal review provisions at all. He barely mentioned section 6. Let me say a word about this. Sections 2A and 2B of the order say that the State Department and DHS and DNI are to look at our information sharing agreements with other countries and determine whether we have sufficient vetting procedures in place on the basis of the information we're getting from those countries and they're supposed to produce a report. That was tied to the temporary suspension in a sense. The President said because I'm not sure I'm going to suspend and that will free up resources to do the review. We went back to the District Court as counsel knows and said look even if you give them the suspension of entry which is all they've briefed and all that's in their complaint it doesn't get you to the rest of section 2 and it doesn't get you to section 6 surely we can still produce the report that is required by sections 2A and 2B and the District Court in the face of our motion said I enjoined all of section 2 and all of section 6. We have scrupulously complied with that injunction but I want to be clear with the court even if we're wrong about standing and even if we're wrong in the merits the most he ought to be able to get under decisions from this court like Meinhold is an injunction against 2C for Dr. El-Sheikh and his mother-in-law or at most in addition any students whom Hawaii identifies if you conclude that Hawaii has standing. He is conflating the nature of his legal argument with the kind of relief to which his plaintiffs are entitled if their claim prevails in the merits and Meinhold in other cases say no matter what the scope of his legal argument and what it would suggest about the propriety of the order at most his clients get an injunction that addresses their injuries. Here that's Dr. El-Sheikh and his mother-in-law and maybe a handful of students and 2C. Not the rest of section 2 and nothing in section 6. Unlike the Fourth Circuit case he doesn't have refugee groups he doesn't have anybody seeking refugee admission. Section 6 and the refugee cap shouldn't even be on the table. And look I'll wrap up in the same way yes we did say to the Fourth Circuit last week that the precedent set by this case for the judiciary's role in reviewing the President's national security and immigration authority will long transcend this debate this order and this constitutional moment. Counsel is right that this country is a beacon but what makes it a beacon is the rule of law. Under the settled legal rules for justiciability constitutional and statutory interpretation and injunctive relief what the President did here falls squarely within his constitutional and statutory authority. I know they disagree with this President and many of his policy judgments but none of that converts this into a constitutional crisis and we respectfully submit that this court shouldn't treat it like one. It ought to leave this debate where it belongs in the political arena. The United States respectfully submits that this injunction should be vacated or at a minimum substantially narrowed. Thank you Your Honors. Thank you Solicitor General Law and thank you Counsel Katyal. The court appreciates the very high quality of the arguments on both sides. The court will now take a recess for I will say this case is submitted at this point and the court will take a recess for 20 minutes.
judges: Hawkins, Gould, Paez